UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

| | |
|---|---|
| CHRISTINA GRACIE (ALONZO), | Case No.  19-cv-01916-RMI |
| Plaintiff, | |
| v. | **ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT** |
| COMMISSIONER OF SOCIAL SECURITY, | Re: Dkt. Nos. 17, 20 |
| Defendant. | |

Plaintiff, Christina Gracie, seeks judicial review of an administrative law judge ("ALJ") decision denying her application for disability insurance benefits under Title II of the Social Security Act. Plaintiff's request for review of the ALJ's unfavorable decision was denied by the Appeals Council, thus, the ALJ's decision is the "final decision" of the Commissioner of Social Security which this court may review. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). Both parties have consented to the jurisdiction of a magistrate judge (dkts. 9 & 10), and both parties have moved for summary judgment (dkts. 17 & 20). For the reasons stated below, the court will grant Plaintiff's motion for summary judgment, and will deny Defendant's motion for summary judgment.

## LEGAL STANDARDS

The Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). A district court has a limited scope of review and can only set aside a denial of benefits if it is not supported by substantial evidence or if it is based on legal error. *Flaten v. Sec'y of Health & Human Servs*., 44 F.3d 1453, 1457 (9th Cir. 1995). The phrase "substantial evidence" appears throughout administrative law and directs courts in their review of factual findings at the agency level. *See Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as

2    adequate to support a conclusion." *Id*. at 1154 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S.

3    197, 229 (1938)); *see also Sandgathe v. Chater*, 108 F.3d 978, 979 (9th Cir. 1997). "In

4    determining whether the Commissioner's findings are supported by substantial evidence," a

5    district court must review the administrative record as a whole, considering "both the evidence

6    that supports and the evidence that detracts from the Commissioner's conclusion." *Reddick v.

7    Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The Commissioner's conclusion is upheld where

8    evidence is susceptible to more than one rational interpretation. *Burch v. Barnhart*, 400 F.3d 676,

9    679 (9th Cir. 2005).

**PROCEDURAL HISTORY**

11         In September of 2015, Plaintiff filed an application for disability insurance benefits,

12   alleging an onset date of October 20, 2014. *See* Administrative Record "*AR*" at 15.[1] As set forth in

13   detail below, the ALJ denied the application on December 13, 2017. *Id*. at 15-29. The Appeals

14   Council denied Plaintiff's request for review on February 12, 2019. *See id*. at 1-4.

**SUMMARY OF THE RELEVANT EVIDENCE**

16         Plaintiff was born with a faulty heart valve that would not close properly which, later in

17   life, caused her to suffer two strokes: in 1999 she suffered a mild, right-frontal stroke; and, in

18   October of 2014, she suffered a more serious acute, left-sided ischemic stroke causing residual

19   muscular weakness in the right side of her body and expressive aphasia (a partial loss of the ability

20   to produce language). *Id*. at 19. Despite her first stroke in 1999, Plaintiff graduated from

21   Pepperdine University in 2001 with degrees in economics and business administration. *Id*. at 429.

22   Before her second stroke, Plaintiff had passed a rigorous exam covering financial industry

23   regulations, taxation, retirement plans, annuities, mutual funds, stocks, and bonds; as a result of

24   which, she was licensed to sell securities and other investment products to the public, and had

25   been steadily employed by firms such as Citigroup, Inc. and Morgan Stanley. *Id*. at 44, 182.

26   However, as a result of the second stroke, she found herself unable function in the workplace and

27

28   _____

[1] The *AR*, which is independently paginated, has been filed in several parts as a number of attachments to Docket Entry #12. *See* (dkts. 12-1 through 12-12).

1    sought disability. *Id*. at 42.

2        In October of 2014, while staying alone in a hotel in San Jose, Plaintiff became

3    increasingly disoriented. *Id*. at 296. While speaking to her husband on the telephone, Plaintiff

4    incorrectly maintained that she was in Los Angeles, causing her husband great concern. *Id*.

5    Plaintiff's husband then contacted the hotel where Plaintiff was staying and asked them to call for

6    an ambulance, but the hotel failed to do so and insisted that Plaintiff was fine; eventually, he

7    decided to drive to San Jose to take Plaintiff to the hospital himself. *Id*. Upon her admission to the

8    John Muir Hospital in Walnut Creek, California, physicians found that Plaintiff was suffering

9    from "facial droop" on the left side of her face, that she was unable to recall her children's ages,

10   and that she had "a strange and flat affect and [that] it [was] difficult to get any detail from her."

11   *Id*. at 288-89. A computed tomography scan of her head revealed the existence of a 2.5 cm x 3 cm

12   frontal lobe mass that physicians described as an "[a]rea of heterogeneous attenuation in the left

13   frontal lobe, which may represent a subacute hemorrhage or a mass." *Id*. at 288. Thereafter, MRI

14   imaging revealed that Plaintiff had suffered an acute ischemic stroke caused by a blood clot that

15   had blocked or plugged a blood vessel in her brain, which consequently interfered with her

16   cerebral blood flow and caused some measure of brain damage. *Id*. at 293-95. The resulting

17   damage to her brain was described by her attending neurologist, Steven Schadendorf, M.D., as

18   including some impairment in her memory as well as damage to her ability to understand or

19   express speech. *Id*. at 300.

20       Before being discharged from the hospital, Plaintiff underwent what appears to be an

21   abbreviated neuropsychological consultation by Alana Vernon, Psy.D., on October 22, 2014. *Id*. at

22   302-04. In the course of that evaluation, it became apparent to Dr. Vernon that Plaintiff was

23   exhibiting "delayed response latencies, consistent with her expressive aphasia." *Id*. at 303. Further,

24   Dr. Vernon noted that in addition to Plaintiff's deficits in producing speech, she also

25   "demonstrated mild difficulties with comprehension for complex information (e.g., requiring a

26   two-step command to be broken down into single steps) that may have been exacerbated by

27   somewhat slowed auditory processing." *Id*. In the end, Dr. Vernon found that Plaintiff may require

28   assistance with ensuring comprehension and that she should be spoken to in a slowed and concise

United States District Court
Northern District of California

1  manner such as to provide her with sufficient time to respond; and, whenever possible, Dr. Vernon

2  recommended "providing the patient with written information." *Id*. at 304. However, as

3  mentioned, this was an abbreviated evaluation performed for the purpose of directing her treating

4  physicians in their dealings with Plaintiff during her hospitalization, and therefore, the evaluation

5  is of little use for present purposes. *See id*.

6         During her hospitalization, Plaintiff's attending neurologist, Dr. Shadendorf noted the

7  persistence of various physical manifestations of the stroke, including Plaintiff's expressive

8  aphasia, and recommended physical therapy, occupational therapy, and speech therapy. *Id*. at 301.

9  One week after her discharge from the hospital, on October 30, 2014, Plaintiff's treating

10  physician, Maha B. Toma, M.D., noted the expressive aphasia and decreased ability to concentrate

11  persisted, as did the weakness and numbness in the right side of her body. *Id*. at 356. Thereafter, in

12  the course of a follow-up visit on December 12, 2014, Dr. Toma once again noted the persistence

13  of the expressive aphasia, the right-sided weakness, and the cognitive impairment caused by the

14  stroke. *Id*. at 358. In fact, Dr. Toma continued to note the persistence of these three manifestations

15  of Plaintiff's second stroke in numerous follow-up visits occurring in January, March, April, May,

16  June, and October of 2015, and throughout 2016. *Id*. at 364, 369, 374, 385, 390, 400, 437-39.

17  During this period, in April of 2015, Plaintiff was again hospitalized due to an event wherein she

18  first experienced nausea, headaches, heart palpitations, and lightheadedness, and then lost

19  consciousness. *Id*. at 310. Also during this period, another of Plaintiff's treating physicians,

20  Patricia Maska, M.D., found that Plaintiff's difficulty with writing and with finding the right

21  words when attempting to speak was persistent. *Id*. at 335, 425. Indeed, Dr. Maska found that

22  Plaintiff's difficulty with expressive speech and persisting cognitive dysfunction continued

23  throughout 2016 and 2017. *See id*. at 418, 456-72, 473-523. Treatment notes from late 2016 and

24  early 2017, reflected that Plaintiff's mental status examinations still indicated significant deficits

25  in her abilities related to language, memory, and other domains of cognitive function. *See id*. at

26  442-450. Specifically, Plaintiff's doctors administered the Montreal Cognitive Assessment Test

27  and found that she "cannot appropriately name objects and repeat phrases," and that she continues

28  to suffer from "impaired attention, calculation, recall, naming (anomia), [] memory retrieval,

United States District Court
Northern District of California

4

executive dysfunction[,] and visuospatial dysfunction." *Id*. at 442. Plaintiff scored a 15 out of 30 on this test, where scores falling below 16.2 represent the threshold for dementia in people with Alzheimer's disease. *Id*. at 50, 442, 449; *see* Pl.'s Mot. (dkt. 17) at 7.

In January of 2016, Plaintiff was referred to Sokley Khoi, Ph.D., for a consultative psychological evaluation. *AR* at 429-32. In the course of this evaluation, Dr. Khoi conducted a clinical interview and a mental status exam, and then administered four diagnostic instruments: (1) the Wechsler Adult Intelligence Scale, Fourth Edition ("WAIS-IV"); (2) the Wechsler Memory Scale, Fourth Edition ("WMS-IV"); (3) the Trail Making Test, Parts A and B ("TMT"); and (4) the Wide Range Achievement Test, Fourth Edition ("WRAT-4"). *Id*. at 429. Describing Plaintiff's background as including undergraduate degrees in economics and business administration from Pepperdine University, as well as a career in the financial services industry, Dr. Khoi noted that due to the toll taken by suffering two strokes, Plaintiff is now unable to even manage her own finances and relies on her partner in that regard. *Id*. at 429-30. Upon conducting a mental status examination, Dr. Khoi identified deficits in Plaintiff's short-delay memory (zero out of three words recalled); her concentration (Plaintiff demonstrated fluctuating concentration, was unable to count forwards or backwards, to or from 100, in increments of 7, and was unable to spell the word "world" backwards); and her abilities regarding language (her speech was slow and demonstrated word-finding problems). *Id*. at 430. Further, describing Plaintiff's history of depression as dating back to 2007, Dr. Khoi noted that Plaintiff's affect was slightly restricted and her mood was depressed. *Id*. at 429, 430.

Plaintiff's test results on the WAIS-IV yielded a full scale IQ score of 75, indicating that Plaintiff now operates in the borderline range of intellectual functioning. *Id*. at 431, 432. As to Plaintiff's memory – Dr. Khoi measured Plaintiff's ability in the areas of immediate visual memory, visual reproduction, and immediate visual and verbal information recall as falling in the extreme low range of functioning, while measuring her abilities relating to logical memory, delayed memory, and auditory memory in the borderline range. *Id*. at 431. As to the TMT, Plaintiff's performance on Part A (which measures psychomotor speed, visual scanning, and sequencing) was indicative of moderate to severe impairment, while her performance on Part B

United States District Court
Northern District of California

1    (which measures psychomotor speed, visual scanning, and mental flexibility) was indicative of

2    mild impairment. *Id*. at 431. Regarding the WRAT-IV, Plaintiff scored in the average range for

3    word reading (letter identification and word recognition); she scored in the low range for sentence

4    comprehension (comprehending ideas and information contained in sentences); lastly, she scored

5    in the below average range in spelling (echoing sounds into written form) and math computation

6    (basic mathematics). *Id*. Consequently, Dr. Khoi's diagnostic impressions (from a non-medical

7    and strictly psychological standpoint) were that Plaintiff suffers from an unspecified

8    neurocognitive disorder and from a chronic adjustment disorder with depressed mood. *Id*. Dr.

9    Khoi then added that based on her educational and employment background, Plaintiff's test results

10   "suggest a decline" from her previous level of functioning, and that the decline "may be" due to

11   her history of stroke. *Id*. at 432. Then, after opining a series of mild to moderate impairments in

12   various work-related abilities, Dr. Khoi noted that "[a]n additional obstacle to adequate work

13   performance may be the claimant's medical condition [which is] beyond the scope of today's

14   evaluation and is deferred to [a] medical opinion." *Id*. Lastly, Dr. Khoi opined that "[d]ue to her

15   decreased cognitive functioning, she may require assistance in managing her funds in her own best

16   interest." *Id*.

17       Thus, by way of summary, the diagnostic impressions found in the record are as follows.

18   As to sensory or motor aphasia resulting in ineffective speech or communication, Dr. Vernon

19   found that Plaintiff exhibited speech production deficits and receptive language difficulties (*see id*.

20   at 303-04), while Drs. Toma and Maska found that Plaintiff's speech production deficits (i.e., her

21   expressive aphasia) persisted for well over three consecutive months after suffering the second

22   stroke in October of 2014 (*see id*. at 335, 345, 358, 364, 369, 374, 385, 390, 400, 418, 425, 437-

23   39, 442-50, 456-72, 473-523). Plaintiff's deficits in memory were well documented by Dr.

24   Vernon's administering of the WMS-IV (*see id*. at 431), and the deficits were also confirmed by

25   Kavita Raj, M.D., when Plaintiff underwent a subsequent consultation at the Neurovascular Clinic

26   at the UCSF Medical Center. *Id*. at 435-36. Regarding Plaintiff's chronic adjustment disorder with

27   depressed mood, Dr. Khoi rendered that diagnosis in January of 2016. *Id*. at 431. As to Plaintiff's

28   attention deficit disorder ("ADD"), Dr. Toma's treatment records indicate that Plaintiff was

6

originally diagnosed with this condition by Dr. Rao and that she was treated for it with Adderal and Ritalin for years, but that she was made to discontinue her use of amphetamine medications after her second stroke on advice of her physicians. *See id*. at 304, 311, 321, 323. Lastly, as to irritable bowel syndrome ("IBS"), this diagnosis was first rendered by Dr. Toma in October of 2015, and continued to appear on the "problem list" of Dr. Toma's treatment notes throughout 2016, and well into 2017. *See id*. at 400, 406, 473, 479, 484, 490, 493-94, 499, 502-03.

In July of 2017, the ALJ convened a hearing at which Plaintiff appeared through a non-attorney representative. *Id*. at 38. Plaintiff's examination by the ALJ began with a discussion of the various functions involved in her past relevant work. *See id*. at 38-48. When the ALJ asked Plaintiff why it was that she claimed to be unable to work after her second stroke, Plaintiff explained that it was the combination of her extreme and persistent fatigue, and the dysfunction of her memory, in particular, as it relates to her inability to recall necessary words when trying to speak. *Id*. at 48-49. Plaintiff was then questioned in somewhat general terms by her non-attorney representative regarding the above-described evidence, as well as being asked about the fact that she cannot manage her own finances and that she otherwise requires a great deal of help with her activities of daily living. *Id*. at 52-56. Next the ALJ asked Plaintiff three basic questions about her IBS issues in a cursory fashion that appeared designed to minimize the issue; the resulting testimony only established that Plaintiff's IBS is "a matter of not being able to go to the bathroom." *Id*. at 56. The ALJ's questioning regarding Plaintiff's persistent fatigue was slightly more detailed, and basically established nothing more than what Plaintiff had already stated – that she suffered from persistent fatigue. *Id*. at 59-60. Thereafter, the ALJ asked Plaintiff a pair of questions about ADD, which established that Plaintiff had in fact been diagnosed with it and that she had been previously prescribed medication for that condition. *Id*. at 64. With that, Plaintiff's examination came to an end, and the ALJ proceeded to examine the vocational expert before adjourning the hearing. *Id*. at 65-69.

**THE FIVE STEP SEQUENTIAL ANALYSIS FOR DETERMINING DISABILITY**

A person filing a claim for social security disability benefits ("the claimant") must show that she has the "inability to do any substantial gainful activity by reason of any medically

1    determinable physical or mental impairment" which has lasted or is expected to last for twelve or

2    more months. *See* 20 C.F.R. §§ 416.920(a)(4)(ii), 416.909.[2] The ALJ must consider all evidence in

3    the claimant's case record to determine disability (*see id*. § 416.920(a)(3)), and must use a five-

4    step sequential evaluation process to determine whether the claimant is disabled (*see id*. §

5    416.920). "[T]he ALJ has a special duty to fully and fairly develop the record and to assure that

6    the claimant's interests are considered." *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983).

7         Here, the ALJ set forth the applicable law under the required five-step sequential

8    evaluation process. *AR* at 16-18. At Step One, the claimant bears the burden of showing he has not

9    been engaged in "substantial gainful activity" since the alleged date on which the claimant became

10   disabled. *See* 20 C.F.R. § 416.920(b). If the claimant has worked and the work is found to be

11   substantial gainful activity, the claimant will be found not disabled. *See id*. The ALJ found that

12   Plaintiff had not engaged in substantial gainful activity since the alleged onset date. *AR* at 18-19.

13   At Step Two, the claimant bears the burden of showing that she has a medically severe impairment

14   or combination of impairments. *See* 20 C.F.R. § 416.920(a)(4)(ii), (c). "An impairment is not

15   severe if it is merely 'a slight abnormality (or combination of slight abnormalities) that has no

16   more than a minimal effect on the ability to do basic work activities.'" *Webb v. Barnhart*, 433 F.3d

17   683, 686 (9th Cir. 2005) (quoting S.S.R. No. 96–3(p) (1996)). The ALJ found that Plaintiff

18   suffered from the following severe impairments: cerebrovascular accident (stroke) with late effects

19   of cerebrovascular disease and an unspecified neurocognitive disorder. *AR* at 19. As to Plaintiff's

20   chronic adjustment disorder with depressed mood, her IBS, and her ADD, the ALJ found those

21   three conditions to be non-severe. *Id*. at 20-21.

22        At Step Three, the ALJ compares the claimant's impairments to the impairments listed in

23   appendix 1 to subpart P of part 404. *See* 20 C.F.R. § 416.920(a)(4)(iii), (d). The claimant bears the

24   burden of showing her impairments meet or equal an impairment in the listing. *Id*. If the claimant

25   is successful, a disability is presumed and benefits are awarded. *Id*. If the claimant is unsuccessful,

26

27   ───────────────

28   [2] The regulations for supplemental security income (Title XVI) and disability insurance benefits (Title II) are virtually identical though found in different sections of the CFR. For the sake of convenience, the court will generally cite to the SSI regulations herein unless noted otherwise.

United States District Court
Northern District of California

the ALJ assesses the claimant's residual functional capacity ("RFC") and proceeds to Step Four. *See id*. § 416.920(a)(4)(iv), (e). Here, the ALJ only considered the two listings relevant to the two conditions that he found to be severe and concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of any of the listed impairments (Listing 11.04, vascular insult to the brain; and Listing 12.02, neurocognitive disorders). *AR* at 21-23. Next, the ALJ determined that Plaintiff retained the RFC to perform work at the light exertional level but involving a series of postural limitations, and limiting Plaintiff to simple, routine, repetitive tasks; occasional interaction with the public; with frequent interaction with coworkers; without working on teams; with the ability to tolerate occasional changes in the routine work setting; with an allowance for being absent one day per month, and being off-task 5% of the time due to psychological symptoms and fatigue. *Id*. at 23-27.

At Step Four, the ALJ determined that Plaintiff is unable to perform her past relevant work. *Id*. at 27. Lastly, at Step Five, the ALJ concluded, based on the RFC, Plaintiff's age, education, and the VE's testimony, that there are jobs that exist in significant numbers which Plaintiff could perform – namely, the ALJ found that Plaintiff could perform the functions of a mail clerk, a cleaner, or an office helper. *Id*. at 28. The ALJ then concluded that Plaintiff had not been under a disability, as defined in the Social Security Act, from the alleged onset date of October 20, 2014, through the date of the decision, December 13, 2017. *Id*. at 29.

## DISCUSSION

Plaintiff raises four issues and contends that the ALJ erred: (1) at Step Three by failing to correctly evaluate Plaintiff's stroke under Listing 11.04; (2) at Step Five by applying the wrong profile under the Medical Vocational Guidelines; (3) by failing to give the proper weight to Plaintiff's treating physicians; and, (4) by discounting Plaintiff's testimony without providing clear and convincing reasons. *See* Pl.'s Mot. (dkt. 17) at 9-14. By way of response, Defendant submits that the ALJ properly found that Plaintiff's condition did not satisfy the criteria under Listing 11.04; that the ALJ applied the correct categories in applying the Medical Vocational Guidelines for light work; that the ALJ properly addressed the information provided by Plaintiff's treating sources because, "[t]here was no opinion for the ALJ to either credit or discredit, as the

1    physician[s] did not address work-related functional abilities"; and finally, that the ALJ properly

2    discounted Plaintiff's disabling pain and symptom testimony. *See* Def.'s Mot. (dkt. 20) at 8-17.

3              As to Plaintiff's first issue – the assertion of error at Step Three due to which Plaintiff

4    claims that the court should award immediate benefits – the court finds that neither party has

5    correctly stated the nature of the ALJ's finding in this regard. Plaintiff contends that her condition

6    clearly satisfies the criteria set forth in the pertinent listing, and Defendant maintains that the

7    ALJ's evaluation under the listing was error-free. The pertinent criteria for evaluating the effects

8    of a stroke under Listing 11.04 (vascular insult to the brain), as relied upon by Plaintiff, requires

9    the existence of "[s]ensory or motor aphasia resulting in ineffective speech or communication []

10   persisting for at least 3 consecutive months after the insult." *See* 20 C.F.R. Pt. 404, Subpt. P, App.

11   1, §11.04(A). While Plaintiff is correct that her physicians have diagnosed expressive aphasia and

12   that the condition has persisted for more than three consecutive months after her stroke, the

13   analysis does not end there. Instead, §11.04's use of the terms "ineffective speech or

14   communication," is further defined as requiring a finding that "there is an extreme limitation in

15   [the] ability to understand or convey your message in simple spoken language resulting in your

16   inability to demonstrate basic communication skills, such as following one-step commands or

17   telling someone about your basic personal needs without assistance." *See id*. at §11.00(E)(1).

18   Thus, Plaintiff is incorrect that her condition has conclusively satisfied the relevant criteria under

19   Listing 11.04(A) because the record was undeveloped in the sense of whether or not Plaintiff's

20   expressive aphasia satisfied the above-described definition in §11.00(E)(1). However, as discussed

21   below, Defendant is also incorrect in asserting that the ALJ correctly evaluated Plaintiff's

22   condition under this listing. Because Plaintiff proceeded before the ALJ without an attorney, and

23   while being afflicted with a number of mental impairments, the ALJ had a heightened duty to see

24   to it that the record was properly developed, and the court finds (as discussed below) that the ALJ

25   failed to discharge this duty, requiring remand for further proceedings.

26            In any event, Plaintiff is also incorrect in maintaining that her condition has conclusively

27   satisfied the alternate provisions found in Listing 11.04(B) or (C). *See* Pl.'s Mot. (dkt. 17) at 10.

28   Plaintiff's reliance on 11.04(B) appears to be a typographic error as that provision requires a

United States District Court
Northern District of California

showing of "[d]isorganization of motor function in two extremities [], resulting in an extreme limitation [] in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities, persisting for at least 3 consecutive months after the insult." *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §11.04(B). In this case, there appears to be no suggestion in either Plaintiff's brief, or in the relevant medical records, that she suffers disorganized motor functions in any extremity, or that it results in any of the above-described postural difficulties. Instead, because of Plaintiff's reliance on what she characterizes as her marked limitations in memory, such as were indicated by her performance on the WMS-IV, it appears that Plaintiff claims to have also satisfied the criteria under §11.04(C), rather than (B). However, marked limitation in memory alone is not sufficient to satisfy the criteria in §11.04(C); that provision requires a showing of marked limitations in one of the three areas of mental functioning *and* marked limitation in physical functioning as defined in §11.00(G)(3)(a). Once again, it is unclear from the poorly developed state of the record if Plaintiff's condition meets the requirements under any of the subparts of Listing 11.04, necessitating further administrative proceedings for proper record development. As mentioned above, the ALJ's questioning of Plaintiff was woefully deficient in that none of the information relevant to the various prongs of the three subparts of Listing 11.04 was developed during the hearing. Nor were any of Plaintiff's treating sources contacted or subpoenaed by the ALJ to develop the record as it relates to this information. In short, the record in this case was too poorly developed for the court to determine whether or not the ALJ's determination at Step Three was supported by substantial evidence.

It is well established that "[t]he ALJ in a social security case has an independent 'duty to fully and fairly develop the record and to assure that the claimant's interests are considered.'" *Tonapetyan v. Halter*, 242 F.3d 1144, 1151 (9th Cir. 2001) (*quoting Smolen*, 80 F.3d 1273, 1288 (9th Cir. 1996)). Because these administrative proceedings are inquisitorial in nature, the ALJ is not permitted to simply sit back and take the role of a mere umpire; instead, the ALJ must scrupulously and conscientiously probe into the matter and actively explore for any and all relevant facts. *See Widmark v. Barnhart*, 454 F.3d 1063, 1068 (9th Cir. 2006) (citing *Higbee v. Sullivan*, 975 F.2d 558, 561 (9th Cir. 1992)). If there is so much as an ambiguity in the evidence

United States District Court
Northern District of California

1   (let alone the gaping hole in the record of this case as it pertains to the provisions of Listing

2   11.04), or if the ALJ – or a reviewing court – finds that the record is inadequate for proper

3   evaluation of the evidence, such a finding likewise triggers the ALJ's duty to conduct an

4   appropriate inquiry. *See Tonapetyan*, 242 F.3d at 1151 (citing *Smolen v. Chater*, 80 F.3d 1273,

5   1288 (9th Cir. 1996)). It is important to note that the existence of this duty to develop the record

6   on the ALJ's part does not depend on a claimant's representation status, and that the duty applies

7   with equal force in the cases of the represented as well as the unrepresented claimant. *Tonapetyan*

8   at 1150. However, in cases where the claimant has proceeded without counsel, or in cases where a

9   claimant may be mentally ill and unable to adequately protect her own interests, the ALJ's duty to

10  develop the record is heightened. *Id*. (citing *Higbee*, 975 F.2d at 562); *see also DeLorme v.*

11  *Sullivan*, 924 F.2d 841, 849 (9th Cir. 1990) ("In cases of mental impairments, this duty [to develop

12  the record] is especially important."); *Jones v. Bowen*, 829 F.2d 524, 526 (5th Cir. 1987) (a

13  claimant need only "raise a suspicion" about his or her impairment in order to trigger the ALJ's

14  duty to develop the record). In this regard, while the ALJ's duty was doubly heightened, it cannot

15  be seriously contended that the ALJ even attempted to satisfy this standard.

16          Because Social Security proceedings are inquisitorial rather than adversarial, "[i]t is the

17  ALJ's duty to investigate the facts and develop the arguments both for and against granting

18  benefits." *Sims v. Apfel*, 530 U.S. 103, 110-11 (2000) (citing Dubin, *Torquemada Meets Kafka:*

19  *The Misapplication of the Issue Exhaustion Doctrine to Inquisitorial Administrative Proceedings*,

20  97 Colum. L. Rev. 1289, 1301-1305, 1325-1329 (1997)); *see also Richardson v. Perales*, 402 U.S.

21  389, 400-01 (1971) ("This, we think, is as it should be, for this administrative procedure, and these

22  hearings, should be understandable to the layman claimant, should not necessarily be stiff and

23  comfortable only for the trained attorney, and should be liberal and not strict in tone and operation.

24  This is the obvious intent of Congress so long as the procedures are fundamentally fair."").

25  Accordingly, on remand, the Defendant is **ORDERED** to do whatever is necessary to fully and

26  fairly develop the record with the requisite attention to detail such that Plaintiff's interests are

27  protected and such that it can be fairly determined whether her condition satisfies any of the

28  subparts of Listing 11.04.

United States District Court
Northern District of California

Additionally, the court also finds that the ALJ erred in finding Plaintiff's ADD, IBS, and chronic adjustment disorder with depressed mood to be non-severe at Step Two. At Step Two of the sequential evaluation process, the ALJ must determine if a claimant has a "severe medically determinable physical or mental impairment." 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii) (2015); *see also Smolen*, 80 F.3d at 1289-90. Impairments must result "from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 416.908 (2010). A medically determinable impairment is considered "severe" if it "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(a)(4)(iii) & (c), 416.920(a)(4)(iii) & (c); see also SSR 96-3p, 1996 SSR LEXIS 10, 1996 WL 374181 *1. Basic work activities are those "abilities and aptitudes necessary to do most jobs," including, for example, "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling; capacities for seeing, hearing and speaking; understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b), § 416.921(b). It is important to note, however, that the Step Two inquiry is merely a threshold determination as to whether a claimant has raised a "*prima facie* case of a disability." *Hoopai v. Astrue*, 499 F.3d 1071, 1076 (9th Cir. 2007); *see also Smolen*, 80 F.3d at 1290 (noting the Step Two determination is a *de minimis* screening device used to dispose of groundless claims). For this reason, "[a]mple authority cautions against a determination of nondisability at step two." *Ortiz v. Commissioner of Social Sec.*, 425 F. App'x 653, 655 (9th Cir. 2011) (citing *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987); *see also Webb*, 433 F.3d 683, 686 (9th Cir. 2005), *Smolen*, 80 F.3d at 1290. An impairment or combination of impairments may be found "not severe only if the evidence establishes [that there is only] a slight abnormality that has no more than a minimal effect on an individual's ability to work." *Id*.

Furthermore, when evaluating a disability application in which a plaintiff claims a mental impairment, the ALJ is required to follow a "special technique" at Steps Two and Three. 20 C.F.R. § 416.920a(a). At Step Two, the ALJ must first evaluate the claimant's "pertinent symptoms,

signs, and laboratory findings" in order to determine the existence of one or more "medically determinable mental impairment(s)." 20 C.F.R. § 416.920a(b)(1); *see also Keyser v. Comm'r SSA*, 648 F.3d 721, 725 (9th Cir. 2011) (interpreting 20 C.F.R. § 404.1520a, the parallel, and identically worded, regulation under Title II). Second, the ALJ must then rate "the degree of functional limitation" caused by the mental impairments just identified, in four broad areas of functioning: activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation. 20 C.F.R. § 416.920a(b)(2) & (c)(1)-(3); *Keyser*, 648 F.3d at 725. The degrees can be "none," "mild," "moderate," "marked," or "extreme." 20 C.F.R. § 416.920a(c)(4). Episodes of decompensation – being numeric, or episodic, in nature – are ranked as, "none," "one or two," "three," and "four or more." *Id*. Third, the ALJ must next determine the severity of the mental impairment, "in part based on the degree of functional limitation." 20 C.F.R. § 416.920a(d); *Keyser*, 648 F.3d at 725. The ALJ then proceeds to Step Three only if the mental impairment is "severe." *Keyser*, 648 F.3d at 725. At Step Three, the ALJ is then tasked with determining if the one or more severe mental impairments identified in Step Two meets or equals the severity of the relevant mental impairment or impairments in the Listings. 20 C.F.R. § 416.920a(d)(2); *Keyser*, 648 F.3d at 725.

Here, at Step Two, with little to no indication of the requisite discussion described above, the ALJ casually found Plaintiff's IBS to be non-severe by relying on the inadequacy of his own examination of Plaintiff during the hearing to find that her IBS simply equated to an inability to go to the bathroom. *See AR* at 20. However, as mentioned above, the IBS diagnosis was first rendered by Dr. Toma in October of 2015, and it consistently appeared on the active problem list in Plaintiff's medical records well into 2017. *See id*. at 400, 406, 473, 479, 484, 490, 493-94, 499, 502-03. As to Plaintiff's ADD, the ALJ misconstrued or misstated the record by incorrectly finding that "no medical source diagnosed the claimant with this condition and she never sought treatment." *Id*. Putting aside the fact that Plaintiff told the ALJ at the hearing that she was diagnosed with this condition, Dr. Toma's recitation of Plaintiff's medical records made it clear that Plaintiff had been diagnosed with ADD by Dr. Rao and that she had been medicated for the condition until the time of her second stroke in 2014. *See id*. at 304, 311, 321, 323. Lastly, as to

1    Dr. Khoi's diagnosis of a chronic adjustment disorder with depressed mood (*see id*. at 431), the

2    ALJ appears to have improperly discounted the severity of Plaintiff's ADD as well as the

3    adjustment disorder by suggesting that Plaintiff was "performing significant activities of daily

4    living contradicting the severity of these impairments, including taking public transportation,

5    driving regularly[,] attending religious activities, and eating at restaurants." *See id*. at 20. If

6    Plaintiff's daily activities included flying a plane, or performing surgery, or some other activity

7    that was logically related to the mental impairments in question, perhaps the court could infer that

8    the performance of those daily activities undercut the suggestion that her mental impairments

9    imposed any degree of significant limitation in any relevant area of functioning. However, it is

10   laughable to suggest that the "ability" to ride a bus, or to attend a religious service, or to eat a meal

11   at a restaurant means that an attention deficit disorder or an adjustment disorder does not impose

12   any significant limitations on any area of work-related functioning. Accordingly, because the

13   record establishes that Plaintiff's IBS, ADD, and adjustment disorder are not groundless claims,

14   that they each easily satisfy the *de minimis* standard under Step Two's screening function, and that

15   they all impose significant limitations on Plaintiff's ability to function, the ALJ's determination of

16   non-severity as to these three conditions at Step Two is **REVERSED**. On remand, the ALJ is

17   directed to fully and fairly develop the record as to these impairments by inquiring as to the degree

18   of limitations they impose, from Plaintiff, as well as from her treating and examining physicians.

19          Lastly, because Dr. Khoi's evaluation expressly stated that "[a]n additional obstacle to

20   adequate work performance may be the claimant's medical condition [which is] beyond the scope

21   of today's evaluation and is deferred to [a] medical opinion" (*see id*. at 432), it is clear to the court

22   that the record in this case manifests yet another ambiguity, one that that requires a consultative

23   examination by a medical doctor with specialization in neuropsychiatric disorders. It is well

24   established that "one of the means available to an ALJ to supplement an inadequate medical

25   record is to order a consultative examination, i.e., 'a physical or mental examination or test

26   purchased for [a claimant] at [the Social Security Administration's] request and expense.'" *Reed v.

27   Massanari*, 270 F.3d 838, 841 (9th Cir. 2001) (citing 20 C.F.R. §§ 404.1519, 416.919). Ordinarily,

28   while "[t]he government is not required to bear the expense of an examination for every claimant,"

consultative examinations are normally required when additional evidence is needed or when there is an "ambiguity or insufficiency in the evidence [that] must be resolved." *Id.* at 842 (citing 20 C.F.R. §§ 404.1517-19). The court finds that to be the case here based on Dr. Khoi's express statement to that effect; therefore, on remand the ALJ is **ORDERED** to procure a suitable consultative examination by a medical doctor with specialization in neuropsychiatric disorders such as to properly develop the record as to Plaintiff's psychiatric condition.

**CONCLUSION**

Accordingly, for the reasons stated above, Plaintiff's Motion for Summary Judgment (dkt. 17) is **GRANTED**, and Defendant's Motion for Summary Judgment (dkt. 20) is **DENIED**. The case is **REMANDED** for further proceedings consistent with the instructions provided herein. Additionally, on remand, the ALJ is instructed to consider the other issues raised in Plaintiff's briefing and to modify the opinion as appropriate. *See Cortes v. Colvin*, No. 2:15-cv-02277-GJS, 2016 U.S. Dist. LEXIS 40580, 2016 WL 1192638, at *4 (C.D. Cal. Mar. 28, 2016); *Cochran v. Berryhill*, No. 3:17-cv-00334-SB, 2017 U.S. Dist. LEXIS 212380, at *21 (D. Or. Dec. 28, 2017).

**IT IS SO ORDERED.**

Dated: July 24, 2020

_____
ROBERT M. ILLMAN
United States Magistrate Judge